# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **The County of Madison, State of Illinois;** | ) |
| **The County of St. Clair, State of Illinois;** | ) |
| **The County of Monroe, State of Illinois;** | ) |
| **The Wood River Drainage and** | ) |
| **Levee District; The Metro-East** | ) |
| **Sanitary District; The Prairie DuPont** | ) |
| **Levee and Sanitary District;** | ) |
| **The Fish Lake Drainage and Levee District;** | ) |
| **The Southwestern Illinois Flood Prevention** | ) |
| **District Council; The City of Alton, Illinois;** | ) |
| **The Village of Caseyville, Illinois;** | ) |
| **The Village of Dupo, Illinois;** | ) |
| **The Village of East Carondelet, Illinois;** | ) |
| **The City of Granite City, Illinois;** | ) |
| **The City of Madison, Illinois;** | ) |
| **The Village of Pontoon Beach, Illinois;** | ) |
| **The Village of Sauget, Illinois;** | ) **Case No. 3:10-cv-00919-JPG-DGW** |
| **The City of Venice, Illinois;** | ) |
| **The Village of Alorton, Illinois;** | ) |
| **The City of Centreville, Illinois;** | ) |
| **The Village of East Alton, Illinois;** | ) |
| **The City of East St. Louis, Illinois;** | ) |
| **The Village of Fairmont City, Illinois;** | ) |
| **The Village of Glen Carbon, Illinois;** | ) |
| **The Village of Roxana, Illinois;** | ) |
| **James Pennekamp; Kevin Riggs;** | ) |
| **And The Leadership Council** | ) |
| **Southwestern Illinois,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| **The Federal Emergency Management** | ) |
| **Agency; The United States Department of** | ) |
| **Homeland Security; and W. Craig Fugate** | ) |
| **in his Official Capacity as Administrator of** | ) |
| **The Federal Emergency Management** | ) |
| **Agency,** | ) |
| | ) |

1

6216810-2

Defendants.                              )

## Complaint

All Plaintiffs bring this action for injunctive relief against the Federal Emergency Management Agency, the United States Department of Homeland Security and W. Craig Fugate in his official capacity as Administrator of the Federal Emergency Management Agency (all collectively hereafter referred to as "FEMA"), on grounds of denial of their rights of due process of law and equal protection of the law as guaranteed by the Fifth Amendment to the United States Constitution. Certain Plaintiffs, denominated the Administrative Appeal Plaintiffs, also bring this action seeking judicial review pursuant to 42 U.S.C. § 4104(g) and 5 U.S.C. § 701 et seq. of final determinations by FEMA upon administrative appeals by those plaintiffs.

### Allegations Common To All Counts

1.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331, in that this action arises under the Fifth Amendment of the United States Constitution and federal statutes, namely, 42 U.S.C. § 4104 and 5 U.S.C. § 701 et seq., pertaining to judicial review of final determinations by FEMA upon administrative appeals.

2.     Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b), in that a substantial part of FEMA's actions and omissions giving rise to the controversy occurred in this District and the property affected by FEMA's

decisions is located within this District.  Venue is also proper pursuant to 42 U.S.C. § 4104(g) in that the Administrative Appeal Plaintiffs are located within this District.

## Summary of the Action

3.      This action arises from FEMA's decision to de-accredit the five levee systems that protect the American Bottoms area in Southwestern Illinois from flooding by the Mississippi River and its tributaries.  The de-accreditation of the levees by FEMA will:

A.      Impose enormous costs such as the mandatory purchase of flood insurance on the residents and businesses in the area, many of which cannot afford such costs.

B.      Greatly depress land values in the area.

C.      Curtail the governmental powers of the Plaintiff local governments to plan for land use and economic development.

D.      Require the local communities to adopt building and zoning codes that will make new building so onerous as to effectively put an end to any further development or improvement of properties in the American Bottoms area.

E.      Inhibit the local communities' ability to improve flood protection by establishing a regulatory floodway with correspondingly high base flood elevations on the landside of the levees.

6216810-2

In deciding to de-accredit the levees, FEMA acted arbitrarily, relying on very limited, secret and highly flawed data and analysis, and directing the preparation of flood studies and maps on the basis of expediencies of time and cost rather than scientific and technical evidence as required by governing legislation.  The agency further ignored the express commands of the governing statutes and regulations to consult with local elected officials and communities **before** engaging in activities such as de-accrediting levees that have been repeatedly found acceptable after inspection by the U.S. Army Corps of Engineers ("USACE" or "the Corps"), and that have protected the area from high water events well in excess of the FEMA base flood standard.

### The Parties

4.      Defendant the Department of Homeland Security is a department within the Executive Branch of the United States.  Defendant the Federal Emergency Management Agency is an agency within the Department of Homeland Security, and Defendant W. Craig Fugate is its Director/Administrator.

5.      FEMA administers the National Flood Insurance Program established by 42 USC § 4001, et seq., (the "NFIP" or the "Act").  In so doing, FEMA prepares and issues Flood Insurance Rate Maps ("FIRMs"), and recognizes or accredits levee systems that meet standards promulgated by the agency.  A list of acronyms used herein is attached.

6.      The NFIP, while establishing a national flood insurance program, expressly directs FEMA and its Director/Administrator to consult extensively with local elected officials and local communities in carrying out FEMA's responsibilities under the Act.  Section 4107 of the Act provides:

"Consultation with local officials:  Scope

In carrying out his responsibilities under the provisions of this title and the National Flood Insurance Act of 1968 which relate to notification to and identification of flood-prone areas and the application of criteria for land management and use, including criteria derived from data reflecting new developments that may indicate the desirability of modifying elevations based on previous flood studies, <u>the Director shall establish procedures assuring adequate consultation with the appropriate elected officials of general purpose local governments, including but not limited to those local governments whose prior eligibility under the program has been suspended. Such consultation shall include, but not be limited to, fully informing local officials at the commencement of any flood elevation study or investigation undertaken by any agency on behalf of the director concerning the nature and purpose of the study, the areas involved, the manner in which the study is to be undertaken, the general principles to be applied, and the use to be made of the data obtained.</u>  The Director shall encourage local officials to disseminate information concerning such study widely within the community, so that interested persons will have an opportunity to bring all relevant facts and technical data concerning the local flood hazard to the attention of the agency during the course of the study." (emphasis added)

7.      Except for the Leadership Council, Plaintiffs are all either owners or lessors of real property in the American Bottoms area of Southwestern Illinois. The area generally encompasses in excess of 176 square miles of land between the Mississippi River levees ("the levees") and the River Bluffs just above Bluff Road in Madison, St. Clair and Monroe Counties, Illinois.  Maps of the Bottoms area are attached as Exhibits 4, 5 and 6.  FEMA has jurisdiction to accredit the levees in question as prescribed in the NFIP.  Plaintiffs in this action seek injunctive relief

to prevent FEMA from de-accrediting the levees and from making effective proposed new FIRMs that show base-flood elevations (BFEs) as if the levees did not exist.

8.      Plaintiff Madison County is a political subdivision of the State of Illinois having jurisdiction over a portion of the American Bottoms protected by the levees.  It is a "community" as defined in the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.  Madison County owns land in the American Bottoms area, including 39 parks.  The County has governmental jurisdiction over approximately 74 square miles of land in incorporated areas of the Bottoms, and 26 square miles of land in unincorporated areas.  The County plans, designs, and manages development and land use in that area.  It oversees the implementation of its long-range master plan for development and land use, plans for future growth, and manages the environmental resources in that area.  The County does so to improve the economic and environmental quality of life for the citizens of the County.

9.      Plaintiff St. Clair County is a political subdivision of the State of Illinois and has jurisdiction over a portion of the American Bottoms area protected by the levees.  St. Clair County is a "community" as defined in the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.  St. Clair County also owns land in the American Bottoms area.   The County has governmental jurisdiction over approximately 51 square miles of land in incorporated areas of the Bottoms, and 17 square miles of land in unincorporated areas.  The County plans, designs, and manages development and land use in that area.  It oversees the implementation of

6

its long-range master plan for development and land use, plans for future growth, and manages the environmental resources in that area. The County does so to improve the economic and environmental quality of life for the citizens of the County. St. Clair County is aggrieved by and an appellant from the proposed and erroneous BFEs and FIRMS published by FEMA on July 15 and 22, 2009.

10.     Plaintiff Monroe County is a political subdivision of the State of Illinois and has jurisdiction over a portion of the American Bottoms area protected by the levees. Monroe County is a "community" as defined by the NFIP, 423 USC § 4381 and 44 CFR § 59.1. Monroe County also owns land in the American Bottoms area. The County has governmental jurisdiction over approximately 4 square miles of land in incorporated areas of the Bottoms, and 4 square miles of land in unincorporated areas. The County plans, designs, and manages development and land use in that area. It oversees the implementation of its long-range master plan for development and land use, plans for future growth, and manages the environmental resources in that area. The County does so to improve the economic and environmental quality of life for the citizens of the County.

11.     Plaintiff Wood River Drainage and Levee District ("Wood River DLD") is a political subdivision of the State of Illinois and has jurisdiction over portions of the American Bottoms area as well as being the owner of levees and related levee and drainage structures. Wood River DLD is a "community" as defined in the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1. Wood River DLD is the owner of land in the American Bottoms, and it owns approximately 21

7

miles of main line urban levee, 164 related relief wells, and other related structures such as closure structures, gravity drains and pump stations.  The Wood River DLD system protects significant residential areas and industrial development areas in the Bottoms area.

12.     Plaintiff Metro East Sanitary District ("MESD") is a political subdivision of the State of Illinois and has jurisdiction over portions of the American Bottom areas affected by the levees.  MESD is a "community" as defined in the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.  MESD is the owner of land in the American Bottoms.  It also owns approximately 37.5 miles of main line urban levee, 16,425 feet of flood wall, 52.5 miles of canals and sanitary sewers in the service of the District.  The MESD system protects significant residential development and industrial development in its 96 square miles of Bottom lands.  In addition, MESD is aggrieved by and an appellant from the proposed and erroneous BFEs and FIRMS published by FEMA on July 15 and 22, 2009.

13.     Plaintiff Prairie DuPont Levee and Sanitary District ("Prairie DuPont") is a political subdivision of the State of Illinois and has jurisdiction over a portion of the American Bottoms area protected by the levees.  Prairie DuPont is a "community" as defined in the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.  Prairie DuPont owns 10.3 miles of urban levee and related flood control structures in the District.  The District protects residential areas and industrial development.

8

14.     Plaintiff Fish Lake Drainage and Levee District ("Fish Lake") is a political subdivision of the State of Illinois and has jurisdiction over a portion of the American Bottoms area protected by the levees.  Fish Lake is a "community" as defined the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.  Fish Lake owns 4.9 miles of main line levee and related gravity drains.  Fish Lake protects some residential and development ground as well as agricultural land.

15.     Plaintiff Southwestern Illinois Flood Prevention District Council ("the District Council") is a political subdivision of the State of Illinois having inter-governmental powers relating to levee repair and flood prevention within the American Bottoms.  The members of the District Council's Board of Directors are appointed by the County Board Chairmen of Madison, St. Clair and Monroe Counties and serve by virtue of their positions on the boards of their respective county flood prevention districts.  The District Council leases real property in the American Bottoms area.

16.     Plaintiff City of Alton ("Alton") is a political subdivision of the State of Illinois and has jurisdiction over a portion of the American Bottoms protected by the levees.  It is a "community" as defined in the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.  The City of Alton also owns land in the American Bottoms area, and it has land use jurisdiction over the land within its boundaries.  In addition, the City of Alton is aggrieved by and an appellant from the proposed and erroneous BFEs and FIRMs published by FEMA on July 15 and 22, 2009.

17.     Plaintiff Village of Caseyville ("Caseyville") is a political subdivision of the State of Illinois and has jurisdiction over a portion of the American Bottoms protected by the levees.  It is a "community" as defined in the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.   The Village of Caseyville also owns land in the American Bottoms area, and it has land use jurisdiction over the land within its boundaries.  In addition, the Village of Caseyville is aggrieved by and an appellant from the proposed and erroneous BFEs and FIRMs published by FEMA on July 15 and 22, 2009.

18.     Plaintiff Village of Dupo ("Dupo") is a political subdivision of the State of Illinois and has jurisdiction over a portion of the American Bottoms protected by the levees.  It is a "community" as defined in the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.  The Village of Dupo also owns land in the American Bottoms area, and it has land use jurisdiction over the land within its boundaries.  In addition, the Village of Dupo is aggrieved by and an appellant from the proposed and erroneous BFEs and FIRMs published by FEMA on July 15 and 22, 2009.

19.     Plaintiff Village of East Carondelet ("East Carondelet") is a political subdivision of the State of Illinois and has jurisdiction over a portion of the American Bottoms protected by the levees.  It is a "community" as defined in the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.  The Village of East Carondelet also owns land in the American Bottoms area, and it has land use jurisdiction over the land within its boundaries.  In addition, the Village of East

10

Case 3:10-cv-00919-JPG -DGW   Document 2   Filed 11/15/10   Page 11 of 56

Carondelet is aggrieved by and an appellant from the proposed and erroneous BFEs and FIRMs published by FEMA on July 15 and 22, 2009.

20.     Plaintiff City of Granite City ("Granite City") is a political subdivision of the State of Illinois and has jurisdiction over a portion of the American Bottoms protected by the levees.  It is a "community" as defined in the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.  The City of Granite City also owns land in the American Bottoms area, and it has land use jurisdiction over the land within its boundaries.  In addition, the City of Granite City is aggrieved by and an appellant from the proposed and erroneous BFEs and FIRMs published by FEMA on July 15 and 22, 2009.

21.     Plaintiff City of Madison is a political subdivision of the State of Illinois and has jurisdiction over a portion of the American Bottoms protected by the levees.  It is a "community" as defined in the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.  The City of Madison also owns land in the American Bottoms area, and it has land use jurisdiction over the land within its boundaries. In addition, the City of Madison is aggrieved by and an appellant from the proposed and erroneous BFEs and FIRMs published by FEMA on July 15 and 22, 2009.

22.     Plaintiff Village of Pontoon Beach ("Pontoon Beach") is a political subdivision of the State of Illinois and has jurisdiction over a portion of the American Bottoms protected by the levees.  It is a "community" as defined in the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.  Pontoon Beach also owns

11

land in the American Bottoms area, and it has land use jurisdiction over the land within its boundaries.   In addition, Pontoon Beach is aggrieved by and an appellant from the proposed and erroneous BFEs and FIRMs published by FEMA on July 15 and 22, 2009.

23.    Plaintiff Village of Sauget ("Sauget") is a political subdivision of the State of Illinois and has jurisdiction over a portion of the American Bottoms protected by the levees.  It is a "community" as defined in the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.  The Village of Sauget also owns land in the American Bottoms area, and it has land use jurisdiction over the land within its boundaries.  In addition, the Village of Sauget is aggrieved by and an appellant from the proposed and erroneous BFEs and FIRMs published by FEMA on July 15 and 22, 2009.

24.    Plaintiff City of Venice ("Venice") is a political subdivision of the State of Illinois and has jurisdiction over a portion of the American Bottoms protected by the levees.  It is a "community" as defined in the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.  Venice also owns land in the American Bottoms area, and it has land use jurisdiction over the land within its boundaries. In addition, Venice is aggrieved by and an appellant from the proposed and erroneous BFEs and FIRMs published by FEMA on July 15 and 22, 2009.

25.    Plaintiff The Village of Alorton ("Alorton") is a political subdivision of the State of Illinois and has jurisdiction over a portion of the American Bottoms protected by the levees.  It is a "community" as defined in the

12

NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.   Alorton also owns land in the American Bottoms area, and it has land use jurisdiction over the land within its boundaries.

26.      Plaintiff The City of Centreville ("Centreville") is a political subdivision of the State of Illinois and has jurisdiction over a portion of the American Bottoms protected by the levees.  It is a "community" as defined in the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.  Centreville also owns land in the American Bottoms area, and it has land use jurisdiction over the land within its boundaries.

27.      Plaintiff The Village of East Alton ("East Alton") is a political subdivision of the State of Illinois and has jurisdiction over a portion of the American Bottoms protected by the levees.  It is a "community" as defined in the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.   East Alton also owns land in the American Bottoms area, and it has land use jurisdiction over the land within its boundaries.

28.      Plaintiff City of East St. Louis ("East St. Louis") is a political subdivision of the State of Illinois and has jurisdiction over a portion of the American Bottoms protected by the levees.  It is a "community" as defined in the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.   East St. Louis also owns land in the American Bottoms area, and it has land use jurisdiction over the land within its boundaries.

13

29.     Plaintiff Village of Fairmont City ("Fairmont City") is a political subdivision of the State of Illinois and has jurisdiction over a portion of the American Bottoms protected by the levees.  It is a "community" as defined in the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.  Fairmont City also owns land in the American Bottoms area, and it has land use jurisdiction over the land within its boundaries.

30.     Plaintiff Village of Glen Carbon ("Glen Carbon") is a political subdivision of the State of Illinois and has jurisdiction over a portion of the American Bottoms protected by the levees.  It is a "community" as defined in the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.   Glen Carbon also owns land in the American Bottoms area, and it has land use jurisdiction over land within its boundaries.

31.     Plaintiff Village of Roxana ("Roxana") is a political subdivision of the State of Illinois and has jurisdiction over a portion of the American Bottoms protected by the levees.  It is a "community" as defined in the NFIP, 42 U.S.C. § 4003(a)(1) and 44 C.F.R. § 59.1.   Roxana also owns land in the American Bottoms area, and it has land use jurisdiction over land within its boundaries.

32.     Plaintiff James Pennekamp is a resident of Granite City and lives and owns property in the American Bottoms area protected by the Metro East Levee Systems.

33.     Plaintiff Kevin Riggs is a resident of East St. Louis and lives and owns property in the American Bottoms area protected by the Metro East Levee Systems.

34.     Plaintiff Leadership Council Southwestern Illinois ("Leadership Council") is an association devoted to economic development whose members include approximately 140 people in business, industry, government, education and labor.   The Leadership Council's mission is to attract and retain jobs, stimulate capital investment, and promote economic development throughout southwestern Illinois, including the American Bottoms.  The Leadership Council sues on behalf of its members who own or lease property in the American Bottoms to redress the injuries that those members will sustain if the Court does not enjoin FEMA's illegal and unconstitutional conduct.

## The Metro East Levee Systems

35.     In addition to the levees owned by Wood River DLD, MESD, Prairie DuPont and Fish Lake, USACE owns and maintains the Chain of Rocks Canal East Levee and its associated flood control structures (the "Chain of Rocks" levee).   The Chain of Rocks levee is approximately 8.8 miles in length and protects residential areas and industrial development in the American Bottoms.

36.     The Chain of Rocks levee is part of the entire levee system and associated flood control structures extending from the City of Alton in Madison County to south of the Jefferson Barracks Bridge in Monroe County.   This

Complaint will refer to the four Plaintiff districts and Chain of Rocks collectively as the "Levee Systems."  A map of the Levee Systems is attached as Exhibit 4.

37.     The Levee Systems have been in operation since the late 19th Century.  The Corps designed and constructed the Levee Systems as they exist today, generally in the 1940's and 1950's, adhering to standards promulgated and used by the Corps.  The Congress originally authorized the Levee Systems in the Flood Control Acts of 1936 (East St. Louis, Prairie DuPont), 1938 (Wood River) and 1954 (Fish Lake).  They are designed to protect the American Bottoms area from a flood that reaches a height of 52 feet on the St. Louis Gage, with an additional 2 feet of freeboard, a level roughly equivalent to a 0.2% annual chance flood, more commonly referred to as a 500-year flood.  This is typical for urban levees.

38.     More than 150,000 citizens reside in the American Bottoms area protected by the Levee Systems. See Exhibit 5.   Four thousand business establishments employing more than 50,000 people are located in the American Bottoms area protected by the Levee Systems.  See Exhibit 6.

39.     The design, construction, maintenance and operation of levees and associated structures are critical to their performance in floods, and to the ability of levees to provide protection on their landward sides.  USACE regulates these aspects of levees and flood control structures of the Levee Systems.

40.     FEMA identifies flood prone areas through Flood Insurance Studies (FISs) and publishes FIRMs or Digital FIRMS (DFIRMs).    Three

16

exemplar FIRMS/DFIRMs will be filed herein in large, hard copy format as Exhibits 1, 2, and 3.  Exhibit 1 is an <u>existing</u> FIRM for the East St. Louis downtown/riverfront area, and Exhibits 2 and 3 are FEMA's <u>preliminary and proposed</u> FIRMs for the same area.

41.     Among other features, FIRMs and DFIRMs show graphically on topographic maps (or aerial photos) the land areas likely to be inundated by what is known as the "Base Flood."   A Base Flood is a flood that has a one percent (1%) chance of being equaled or exceeded in any given year.  The Base Flood is commonly referred to as a 100-year flood or the 1 percent annual chance flood.

42.     Under the Act, FISs and FIRMs are supposed to be based on appropriate and reliable technical data and on recognized and accurate scientific or technical analyses.

43.     In a typical river valley, a FIRM for a given area will show, in shaded relief, the extent of inundation by the Base Flood.  The FIRM also will show the BFE, which is the height of the 100-year floodwaters above mean sea level.  In addition, the FIRM will show coded zones that correspond to flood insurance rate classifications, enabling a skilled reader to determine the applicable flood insurance risk category for any given area on the FIRM.  See 44 C.F.R. § 64.3.

44.     Areas subject to inundation by the Base Flood are referred to as Special Flood Hazard Areas (SFHAs).  The NFIP requires that federally regulated lending institutions cannot make, increase, extend, or renew any loan secured by

17

improved real property located in a SFHA in a community participating in the NFIP unless the secured building and any secured personal property are covered for the life of the loan by a flood insurance policy.  The NFIP also requires communities in such areas to enact building codes that impose onerous requirements on any new construction.  For example, any new construction must rest on a platform or fill that elevates the lowest floor of a structure above the BFE.  In the American Bottoms, such a mandate would mean constructing fill platforms or buttes up to 20 feet high for any new structures.

45.     FEMA is supposed to accredit a levee that will protect lands from a 100-year flood, based on the design, construction, maintenance and operation requirements set forth in 44 C.F.R. § 65.10 ("§65.10"), as certified by a registered engineer or an appropriate Federal agency.  The area landward of an accredited system is shown as protected on the applicable FIRM and not subject to the flood insurance requirement and building restrictions of a SFHA.  These areas are typically shown on the FIRMs as being in Zone X, meaning areas of minimal flood hazards.

46.     Currently FEMA accredits the Levee Systems and recognizes that they provide protection from the Base 100-year Flood.  Consequently, the applicable, existing FISs and FIRMs reflect that finding and show the American Bottoms area on the landward side of the levees as largely in Zone X, which 44 C.F.R § 64.3 defines as an "area of minimal hazards."  As a result, no there are no BFEs on the landward side of the levees relating to Mississippi River flooding.

18

47.     Exhibit 1, the current FIRM for downtown East St. Louis, shows these features.  The BFE is shown only on the river side of the levee, represented by three rippled lines extending from the State Boundary in the middle of the Mississippi River to the river side of the levees, which are drawn as horizontally hatched lines.  The BFE rippled lines are marked with the BFE elevation numbers of 426, 426, and 427.  Most of the ground on the landward side of the levees is marked as Zone X, which the FIRM defines as "areas protected by levees from 100-year flood."  The floodway is shown at or near the top of the river side of the levees.

48.     The Corps inspects the Levee Systems both annually and periodically.  The periodic inspections usually occur at three year intervals, in accordance with Public Law 84-99, to determine if levee systems will perform as expected at the levels authorized by Congress, which is 52 plus 2 feet of freeboard on the St. Louis gage, i.e., protection from a 500-year flood.  These inspections are thorough and highly documented.  The periodic inspections are comprehensive assessments by a multidisciplinary team led by a professional engineer that apply the judgment and experience of professional technical personnel with a working knowledge of each of the specific features in the flood protection systems that comprises the Levee Systems.  In addition to the field inspection, the Corps considers additional information such as the results of previous inspections, flood-fighting records, studies and the past performance of the system to gain historical

perspective.  The inspectors also interact with the levee district personnel to share information.

49.     In upwards of 60 years since the Metro East Levee Systems were originally built and improved to their current configuration, there has never been a structural or design failure resulting in flooding from the Mississippi River.

50.     To protect against a 500-year flood in the American Bottoms, the Corps requires the levees to be 452 feet above mean sea level at the St. Louis gage, which corresponds to 52 feet on the gage, plus two extra feet for freeboard. That level of protection is greater than protection against the 100-year flood required by § 65.10.

51.     For every year since 1995, the Corps has rated the Levee Systems as either "acceptable" (the highest rating) or "minimally acceptable."  In that time frame, the Corps has never graded the Levee Systems as fair, poor or unacceptable.

52.     In the periodic inspection most relevant here, the 2007 Inspection No. 8, the Corps found that the Levee Systems were "currently stable and operational although there are deficiencies that require correction."  The Corps noted that the 1993 flood of record (a 300-year event) was "a major test of the system's capability" and that "the system performed satisfactorily."  Referring to the Plaintiff levee districts, the Corps stated that "the maintenance and repair efforts of the drainage and levee districts have been noteworthy."

**FEMA Map Modernization and the Undisclosed 2007 Study**

53.     The National Flood Insurance Reform Act of 1994 (P.L. 103-325) authorized FEMA to modernize FIRMs for the nation.  Congress first appropriated funds for this program in federal fiscal year 2003, with additional funds provided in fiscal years 2004, 2005 and 2006.  In 2006, following the flooding occasioned by Hurricane Katrina, FEMA announced a "mid-course adjustment" to the mapping program to speed the issuance of the new maps.

54.     In late 2006 or early 2007, at an exact time still unknown to Plaintiffs, the Region V office of FEMA in Chicago asked the St. Louis District office of the Corps to investigate the Levee Systems to determine if they would meet the certification/accreditation standards of § 65.10.  On information and belief, FEMA also asked the USACE District office to respond to two questions:

A.     Whether USACE was aware of any conditions that may prevent the Levee Systems from being able to be certified and providing protection from the 100-year Base Flood; and

B.     Whether the same Levee Systems should be eligible for provisional accreditation, known as Provisional Accredited Levee ("PAL") status.

In accordance with its procedures, FEMA could grant PAL status to extend the time that levee owners would have to submit data to demonstrate compliance with § 65.10.  During that extended period, FEMA would consider the affected levees as accredited for the purpose of drawing new FIRMs.

6216810-2

55.     At the behest of FEMA, and apparently sometime before August 15, 2007, the St. Louis District office of the Corps purportedly did investigate the Levee Systems ("the 2007 Study").   On August 15, 2007, FEMA told representatives of the Metro East communities, including some Plaintiffs, that such a study had been performed.  Neither FEMA nor the Corps has disclosed the contents of the 2007 Study or the methodology it used, despite repeated requests since then from Plaintiffs.  In November 2009, Plaintiffs formally requested from FEMA, pursuant to the Freedom of Information Act, the 2007 Study and any other documents, data or analysis that supported the August 2007 decision to de-accredit the Levee System.   FEMA did produce some documents in May 2010 after lengthy delay.   The 2007 Study was not among the documents that FEMA produced.  A similar request was submitted to the Corps in October 2009 and a response was made in December 2009.   The 2007 study was not among the documents that the Corps produced.  Plaintiffs were left to conclude, based on lack of production by the two responsible agencies acting independently, that such a study may not exist or no longer exists.

56.     The governing statute and regulations, 42 U.S.C. § 4107 and 44 C.F.R. § 66.1 et seq., required FEMA to consult with and inform the Metro East communities and local elected officials of conduct, pendency, progress, and prospective findings of the 2007 Study; of the data and methods being used; and of their rights to bring relevant data to FEMA's attention.

57.     The statute and regulations reflect the legislative belief that "assured and active local participation in all aspects of flood plain management is essential to the long-range success of the program."  S. Rep. No. 93-583 (Nov. 29, 1973), reprinted in 1973 U.S.C.C.&.A.N., 3217, 3232.  Congress amended the bill to "requir[e] adequate consultation with appropriate elected local officials."  Id. (emphasis original):

> In particular, it is the committee's desire that the Secretary's [Administrator's] consultation with the appropriate elected officials of general purpose local governments include, but not be limited to, the following specific areas:
>
>> (a)  Specifically requesting that the community submit pertinent data concerning flood hazards, including flooding experiences, plans to avoid potential hazards, estimates of economic impact on the community, both historical and prospective, and such other data as shall be deemed appropriate;
>>
>> (b)  Notifying local officials of the progress of surveys, studies, and investigations, and of proposed findings along with information concerning data a methods employed in reaching such conclusions; and
>>
>> (c)  Encouraging local dissemination of information concerning surveys, studies and investigations so that interested persons will have an opportunity to bring relevant data to the attention of the community and to the Secretary.
>
> Id. at 3236.

58.     FEMA's Procedure Memorandum 34 – Interim Guidance for Studies Including Levees, adopted on August 22, 2005, provides methods for contacting communities protected by levees, for informing them of their obligations to provide documents needed for accreditation, and for setting a

deadline for submitting data.  For reasons unknown to Plaintiffs, FEMA did not follow this Guidance.

59.     In violation of the governing statute and regulations, at no time prior to or during the 2007 Study did FEMA undertake any of the following:

A.     Establish consultation with any elected officials of the general purpose local governments, i.e., the Metro East communities, to inform them about the proposed investigation, or about the nature and extent of the investigation, so that any interested parties would have the opportunity to bring relevant data to the attention of the communities or FEMA.

B.     Inform local officials of the responsibilities placed upon them by the NFIP, or the administrative procedures followed by FEMA, or the role of the communities in establishing or modifying BFEs.

C.     Inform local officials of when the investigation would commence, the manner in which the investigation would be undertaken, or the intended use of the data.

60.     FEMA did produce what appears to be a summary of the 2007 Study, in the form of a printed copy of what appears to be a PowerPoint® presentation (the "2007 Summary").

61.     The 2007 Summary does not state what type of study or studies were conducted.  It does not include any data from the far more detailed Corps 2007 periodic inspection No. 8, which was conducted at the same time, and which

found the Levee Systems acceptable. The summary does refer to two levee features, seepage and drains, and notes anticipated problems with seepage in respect to the four levee systems other than the Corps-owned Chain of Rocks Canal system. With respect to those four systems, the 2007 Summary reaches the conclusion that: "<u>Calculated Factors of Safety (FS) indicate that seepage will be a problem and reduces confidence that the levee can pass the 100-year flood without flood fighting</u>" (emphasis added). Flood fighting techniques are standard operational measures used during periods of high water to identify and control areas of concern such as sand boils.

62.     Neither the FEMA regulation for accrediting levees, § 65.10, nor any other FEMA regulation addresses "Factors of Safety" or the use of flood fighting in the adequacy of a levee system. FEMA did recently issue a policy statement indicating that flood fighting measures may properly be considered in assessing the adequacy of levees.

63.     The 2007 Summary did not recommend de-accrediting the Levee Systems. On information and belief, the unproduced 2007 Study also did not recommend such action.

64.     Moreover, both the 2007 Study and the Summary are inherently flawed and scientifically and technically erroneous, in the following respects:

A.     Section 65.10 requires that levees have an additional height of three feet of freeboard above the elevation of the 100-year Base Flood at any particular point of a levee. On information and belief, based on

Corps analysis included in similar types of studies, the Corps misinterpreted this requirement in the 2007 Study, and assumed a hypothetical BFE three feet greater that the actual BFE for a 100-year flood.  The Corps thus assumed a high-water event substantially higher than § 65.10 actually requires.  This erroneous assumption makes it very likely that the Corps produced inaccurate and overstated estimates of seepage to determine compliance with §65.10 and protection from the 100-year event.

B.    On information and belief based on Corps analysis included in similar types of studies, the 2007 Study disregarded the numerous functioning relief wells that the Levee Systems use to control and manage underseepage, because they "exceeded design life."  Section 65.10 contains no such requirement.  On information and belief, the Study ignored available data that the wells function properly.

C.    There is no indication that the 2007 Study employed standards set forth in § 65.10.  Documents produced in 2010 in response to a FOIA request indicate that the 2007 Study employed Corps standards that are more demanding than § 65.10 and that FEMA knew as much at all relevant times.

D.    The 2007 Summary and, on information and belief, the 2007 Study assumed that the Corps should not consider flood fighting techniques in determining the adequacy of the Levee System.  Nothing in

26

§ 65.10 prohibits consideration of such techniques.  For many years, the Levee Systems all have successfully used flood fighting efforts, in cooperation with the Corps, as part of their operating procedures.

E.      In evaluating the Corps-owned Chain of Rocks levee, the 2007 Summary shows seepage issues essentially identical to the other four levee systems.  It clearly implies that there are "no anticipated problems" with seepage during a 100-year flood, if one considers the availability of flood fighting.

F.      On information and belief, the 2007 Study and Summary not only referenced USACE standard "factors of safety" rather than FEMA standards, but also utilized factors of safety in excess of those specified in USACE engineering circulars.

65.      At some point after the 2007 Study and before August 15, 2007, FEMA decided to de-accredit the Levee Systems.  This decision would and did result in re-mapping in identifying areas landward of the levees as Special Flood Hazard Areas and, for the first time, establishing BFEs in excess of 400 landward of the Levee Systems.  See Exhibits 2 and 3.  On information and belief, the sole scientific and technical basis for that decision was the alleged 2007 Study, a document never produced by FEMA or the Corps.

66.      On August 15, 2007, at the request of a local Congressman, FEMA and the Corps met with the communities and the elected officials of the Metro East on board a Corps vessel.  FEMA announced that it intended to de-accredit all the

Levee Systems, based on "studies completed" by the Corps, an apparent reference to the undisclosed 2007 Study. FEMA gave no advance warning of this announcement, either to the local elected officials or to the communities. FEMA gave none of the communities the opportunity to provide relevant data to either FEMA of the Corps. FEMA did not provide the communities with any of the "studies completed" either then or subsequently, despite numerous requests under both the NFIP and the Federal Freedom of Information Act (FOIA).

67.     On or about October 5, 2007, FEMA sent correspondence to some of the communities in the Metro East area advising that it would issue county-wide FISs and DFIRMs for Madison, St. Clair and Monroe Counties. A copy of one such letter is attached as Exhibit 7. The letter acknowledged that all of the systems in the Levee Systems were then accredited. The FEMA letter then stated:

> "Recently, FEMA was informed by the U. S. Army Corps of Engineers (USACE) that they have determined the levees identified above do not meet the requirements set forth in the Code of Federal Regulations, Title 44, Section 65.10 (44 CFR 65.10), entitled "Mapping of Areas Protected by Levee Systems." Since the levees and levee systems identified above do not meet the requirements set forth in 44 CFR 65.10, they will be de-accredited and therefore will  not be shown on the future DFIRM as providing protection from the base flood."

68.     On information and belief, the Corps never advised FEMA that the Levee Systems did not meet the requirements of § 65.10.

69.     The FEMA letter went on to state that areas in the American Bottoms landward of the levees "will be mapped as a Special Flood Hazard Area (SFHA) on the DFIRM when it is prepared." Such a process necessarily entails

determining and modifying BFEs, because the areas landward of the levees now bearing Zone X designations with no BFE number will upon final remapping bear BFEs of in excess of 400 feet with predominately Zone AR designations.  See Exhibits 1, 2 and 3.

70.     FEMA did not at this time or any other time notify local officials of the studies purportedly performed by the Corps at FEMA's request, nor did FEMA ever produce copies to local officials of any such studies.

71.     Furthermore, FEMA did not notify local officials of the progress of surveys, studies, investigations, and of prospective findings along with data and methods employed in reaching such conclusions.  FEMA also failed to encourage local dissemination of surveys, studies and investigations so that interested persons would have the opportunity to bring relevant data to the attention of the communities and FEMA.

**The November 2007 Directives**

72.     In November 2007, FEMA made two decisions, which it communicated only to its FIRM mapping contractor and kept secret from the elected officials and communities of the Metro East.  First, FEMA elected to set aside the mandates of two of its Procedural Memorandums in relation to its decision to de-accredit the Levee Systems.  These mandates required new hydraulics and hydrology studies ("H and H studies") in the event of a de-accreditation.  H and H studies are scientific and technical investigations of flood

elevations.  In this case, competent new maps that followed the mandated H and H studies and assumed de-accreditation, i.e., the absence of levees, would result in lower BFEs in the American Bottoms landward of the levees.  For example, were a levee to breach and a very large land area to be inundated, the flood elevation would likely be significantly reduced.

73.    Second, FEMA directed its FIRM mapping contractor in November 2007 to issue the new FIRMs with the BFE numbers from the middle of the Mississippi River drawn out all the way to the bluffs surrounding the American Bottoms.  On information and belief, there was and is no scientific or technical basis for such a directive.

74.    FEMA correspondence from its Region V office stated that one reason for the November 2007 Directives was to save the time and expense entailed in performing new H and H studies performed.  Time and expense are not relevant considerations in mapping flood hazard areas under §65.10 standards. FEMA Region V correspondence reveals another reason for the decision:  Despite having not consulted with the local communities, FEMA's came to the belief "that the public is better served by accelerating discussions on the viability of AR zones."   An AR zone is a restoration zone that permits lower flood insurance premiums.   In suggesting accelerated discussions on AR zones, FEMA was attempting to persuade the communities to accede unquestioningly to FEMA's de-accreditation of the Levee Systems.

75.     Although the November 2007 Directives involved the determination or modification of BFEs on the landward side of the Levee Systems, FEMA kept all aspects of them secret from the communities, elected officials and property owners of the Metro East communities in the American Bottoms. FEMA gave no opportunity to be heard to any member of the communities affected or any property owners therein.     The November 2007 Directives also violated the statutes and regulations governing consultation.

**The PAL Status Decision**

76.     In March 2007, FEMA adopted Procedure Memorandum 43 ("PM-43"), Guidelines for Identifying Provisionally Accredited Levees, commonly referred to as PALs.  PM-43 allows production of new FIRMs showing areas landward of levees as remaining protected from the Base Flood, while allowing the levee owners and communities two years to provide the documentation necessary to show compliance with the standards of § 65.10.

77.     The Metro East Levee Systems are and were, by the terms of PM-43, eligible for "Scenario B" PAL status, meaning that the levees could remain in recognized and accredited status for a period of two years while the communities gathered the required documentation.  This is because:

A.     The then and still effective FIRMs showed the levees as providing protection from the base 100-year flood.

B.    There was no reliable information that the levees were inadequate to provide base flood protection.

C.    The project inspection rating was within an acceptable range as defined by the Corps.

78.    A levee's eligibility for PAL status is a decision on a BFE, because it involves the elevation determination on the landward side of a levee.  As a result, FEMA's decision on the Levee System's eligibility for PAL status required it to consult with local officials pursuant to § 4107 and 44 C.F.R. Part 66.  FEMA failed to comply with the statute and regulation, and gave no notice to local officials or opportunity to be heard on this question.

79.    When asked after the fact about possible PAL status by Metro East community officials, FEMA responded that the Levee Systems did not qualify. FEMA produced no data or documents to substantiate that position.

80.    On information and belief, FEMA's decision to deny PAL status to the Levee Systems was not based on any scientific or technical data, other than the flawed and elusive 2007 Study.

81.    On information and belief, FEMA has given PAL status or accredited status to all other levee systems in all other FEMA regions that the Corps has rated as acceptable or minimally acceptable in its annual and periodic inspections.

**FEMA Meetings with Local Communities**

82.     FEMA officials did meet in 2007 with local community officials after the August 15, 2007 meeting when it announced the de-accreditation of the Levee Systems.  At none of these meetings did FEMA address or disclose the scientific or technical bases for the de-accreditation decision, the 2007 Study, the November 2007 Directives, or the PAL Status Decision.  FEMA withheld information about these subjects and actively avoided inquiry about them. Instead, FEMA told local officials that there was adequate information in FEMA's files to support the de-accreditation decision and that their only recourse was to concentrate their efforts in applying for "Zone AR" status for the areas protected by the Metro East Levee Systems.

83.     Zone AR status is a FIRM mapping category defined in FEMA's regulations as an "area of special hazard that results from the decertification of a previously accredited flood protection system that is determined to be in the process of being restored to provide base flood protection."  44 C.F.R. § 64.3.  In order to apply for Zone AR status, local officials must acknowledge in writing that FEMA's decision to de-accredit the Levee Systems was correct.

84.     The elected officials and communities of the Metro East, relying on FEMA's advice regarding Zone AR status, and having been deceived by FEMA concerning certitude of de-accreditation and the quality and extent of the studies that preceded it, did apply to FEMA for Zone AR status.  Under the duress caused by the erroneous information provided by FEMA, the chief local elected

officials of the area signed a "community statement" acknowledging that the Levee Systems did not provide adequate protection from the base flood.

### The 2009 Preliminary FISs and FIRMs

85.    On July 8, 2009, FEMA published in the Federal Register proposed BFEs and proposed modifications of BFEs in Madison, St. Clair and Monroe Counties.   74 <u>Fed Reg</u>. 32480-32489.   FEMA also published this information in a local newspaper twice during that month.

86.    At or about the same time, FEMA published new preliminary Flood Insurance Studies and new preliminary FIRMs for Madison, St. Clair and Monroe Counties. *See, e.g.*, Exhibits 2 and 3.

87.    The proposed BFEs published in the Federal Register and the preliminary FISs and FIRMs are all clearly based on:

A.    The flawed 2007 Study leading to the decision to de-accredit the Metro East Levee Systems.

B.    The November 2007 Directives to waive mandated H & H studies and arbitrarily draw the Mid-Mississippi BFEs out to the American Bottoms bluff line.

C.    The PAL Status Decision.

88.    Thus, the new BFEs, FIS documents and FIRMs all show the landward side of the Metro East Levee Systems as Zone AR or similar zoning with BFEs in excess of 400 feet, rather than Zone X with no BFE numbers as shown in

the existing FIRMs.  The rippled lines showing elevation umbers for BFEs on the preliminary FIRMs are simply drawn from the Mid-Mississippi River to meet ground level near the bluff line on the East of the American Bottoms.  The preliminary FIRMs assume that the Levee Systems do not exist.  In addition, the preliminary FIRMs move the floodway boundary from the river side of the levees to the landward side. See Exhibits 3 and 4.

89.     After the July 8, 2009 publication of the new preliminary BFEs, FISs and FIRMs, FEMA again met with local elected officials.  Again, FEMA refused to consult those officials about de-accreditation even after repeated questioning on the subject.  Instead, FEMA representatives adhered to a prepared script about the availability, terms and conditions of flood insurance.  FEMA representatives privately assured local officials that the de-accreditation decision was well-documented despite their unwillingness to produce any such documentation.

**Administrative Appeals**

90.     Within 90 days following the second newspaper publication of FEMA's proposed flood elevation determinations on July 8, 2009, the following Plaintiffs filed timely administrative appeals:  St. Clair County, MESD, the cities/villages of Alton, Caseyville, Dupo, East Carondelet, Granite City, Madison, Pontoon Beach, and Sauget, (hereafter the "Administrative Appeal Plaintiffs").

91.     The appeals filed by the Administrative Appeal Plaintiffs submitted scientific and technical data that contradicted or negated the information upon which FEMA's proposed BFEs appeared to be based.

92.     Following the publications of the Flood Insurance Studies for Madison, St. Clair and Monroe Counties and the publication of the related preliminary FIRMs for the American Bottoms areas in July 2009, the District Council engaged four registered professional engineering and licensed land surveying firms to evaluate the preliminary FIRMs (hereafter the "DFIRM Review Team").  On September 11, 2009, the DFIRM Review Team published its findings to the District Council and to the communities in the form of a report entitled "Evaluation of Preliminary DFIRMs" (hereafter "Evaluation Report").  A true and accurate copy of the Evaluation Report is attached as Exhibit. 8.  The Evaluation Report included scientific and technical information that addressed the preliminary BFEs and FIRMs proposed by FEMA.

93.     On September 15, 2010, Region V of FEMA wrote to a number of local community officials in the Metro East to announce, *inter alia*, that it would issue resolutions of the appeals, or those appeals it deemed to be protests, later that month.

94.     In the same letter, FEMA stated that it anticipated issuing Letters of Final Determination in June 2011 and that it would finalize the proposed and preliminary FIRMs (or DFIRMs) for Madison, St. Clair and Monroe Counties on or about December 2011.

95.     On or about September 20, 2010 FEMA mailed resolution letters to the Administrative Appeal Plaintiffs.  While conceding some deficiencies in its preliminary data, FEMA essentially resolved the appeals by denying them.

## Harm to Plaintiffs

96.     If FEMA's proposed preliminary FIRMs and BFEs become final, as FEMA states they will in December 2011, Plaintiffs will suffer substantial harm.  The people and businesses located in the American Bottoms area are presently in Zone X and like areas, and may purchase flood insurance but are not required to do so.  The communities likewise may but are not required to adopt building code and land use restrictions relating to all new or substantially improved structures and construction.  After the proposed FIRMs become final, residents and businesses located in the American Bottoms area will be required to purchase flood insurance, at a total estimated annual cost in excess of $50,000,000.  Many of those residents and businesses cannot afford such costly insurance.  A substantial number of the residents, likely more than half, cannot afford flood insurance and will be forced to seek some form of public assistance or face foreclosure of their property, further distressing their communities.

97.     In addition, new flood plain building code and land use restrictions will require onerous and expensive new building requirements, such as the substantial elevation of construction of any new or improved structures on substantial fill mounds, to raise the structures over the new BFEs, in some cases as

much as 20 feet or more above surrounding ground. These requirements will halt private development in the American Bottoms and cripple community development plans; reduce employment; impair industry; and significantly depress land values, diminishing local tax revenues and the ability of local communities to provide essential public services.

98.     In addition, Plaintiffs will be irreparably harmed absent judicial relief, in that:

A.     The Plaintiffs communities as defined in the Act will be deprived of their rights to be consulted about flood studies and investigations and changes in flood mapping, including the right to submit their own data, as required by the Act and its implementing regulations, 42 U.S.C. § 4107 and 44 C.F.R. Part 66.

B.     The Plaintiff communities are entitled to have FEMA follow its governing statute and regulations, rather than act arbitrarily while ignoring the statute and regulations, causing substantial and immeasurable economic harm of Plaintiffs.

C.     Plaintiffs in any event have no recourse to damages because FEMA is immune to relief by way of money damages.

D.     Plaintiff communities will experience substantial economic harm, in that mandatory insurance and land use restriction will cause a halt to all further development and lead to economic hardship and possible

out-migration of residents and businesses, with the attendant loss of tax base and community deterioration.

E.      All Plaintiff landowners and leaseholders will suffer substantial and immeasurable loss of the value of their holdings.

F.      The residents represented by the Plaintiff communities will suffer economic harm in the cost of flood insurance and loss of the value of their land holdings.

G.      Plaintiff communities and levee districts will likely be impeded in any future efforts to improve the Levee Systems because the new preliminary FIRMS place the levees themselves in the floodway. Plaintiffs will be unable to engage in any new construction or improvements without first obtaining "no-rise" certificates pursuant to FEMA regulations.  44 C.F.R. §60.3.  Because the preliminary FIRMs incorporate technically inaccurate and artificially inflated BFE elevation numbers (as a result of the 2007 Study and the November 2007 Directives), it will difficult to submit the engineering data and certification necessary to obtain "no rise" certificates.

## Count I
### (Administrative Appeal – Public Entities)

99.      The Administrative Appeal Plaintiffs restate and hereby incorporate by reference the allegations of ¶¶ 1 through 98 of this Complaint.

100.   The Evaluation Report submitted in connection with the administrative appeals presents significant scientific and technical data finding that the elevations proposed by FEMA on the DFIRMs and in the FISs are wrong, and that FEMA and its contractors used significantly inaccurate data.  See Exhibit 8.  The Evaluation Report specifies the following flaws in the DFIRMs, *inter alia*:

A.   Significant contradictions between peak discharge values listed in the preliminary FIS and the values determined from historic records at pertinent stream gauges.

B.   The use of archaic rainfall data to determine the discharge values listed in the preliminary FIS.

C.   Hydrologic analyses in the preliminary FIS to determine discharge values which use statewide or regional data determined from multiple-regression analyses instead of watershed specific data.

D.   Refusal to incorporate the results of numerous independent detailed engineering studies associated with Letters of Map Change (LOMC), all of which were previously approved by FEMA but were not included in the preliminary DFIRMs.

101.   On or about September 11 and October 12, 2009, St. Clair County filed two timely administrative appeals with FEMA pursuant to 42 U.S.C. § 4104(e) and 44 C.F.R. § 67.  Both appeals pointed out that the elevations proposed by FEMA and the St. Clair County FIRMs were scientifically and technically incorrect because of the use of inferior data and the failure to include

40

relevant data.  The first appeal submitted the Evaluation Report, Exhibit 8, on or about September 11, 2009.  A true and accurate copy of the second appeal, submitted on October 12, 2009, is attached as Exhibit 9.  This copy does not include the digital remapping data that was submitted with the appeal.  The second appeal identified specific errors, such as the use of poor and outdated topographic information, and demonstrated alternative, correct applications and data.

102.    Prior to October 20, 2009, Plaintiffs MESD, Alton, Caseyville, Dupo, East Carondelet, City of Madison, Sauget and Venice filed timely administrative appeals with FEMA.  The appeals pointed out that the elevations proposed by FEMA and the St. Clair County FIRMs were scientifically and technically incorrect because of the use of inferior data and the failure to include relevant data.  True and correct copies of these appeals (without exhibits) are attached as Exhibits 10, 11, 12, 13, 14, 15, 16, and 17.

103.    On September 3, 2009 and October 15, 2009, plaintiff Pontoon Beach filed timely administrative appeals with FEMA.  The appeals pointed out that the elevations proposed by FEMA and the St. Clair County FIRMs were scientifically and technically incorrect because of the use of inferior data and the failure to include relevant data.  Av true and correct copy of one of these appeals (without exhibits) is attached as Exhibits 18.

104.    On October 8 and 13, 2009, Plaintiff Granite City filed timely administrative appeals with FEMA.  The appeals pointed out that the elevations proposed by FEMA and the St. Clair County FIRMs were scientifically and

41

technically incorrect because of the use of inferior data and the failure to include relevant data.   True and accurate copies of the appeals (without exhibits) are attached as Exhibits 19 and 20.

105.     All of the administrative appeals included the Evaluation Report as an exhibit.

106.     On or about September 20, 2010, FEMA denied each and every one of the administrative appeals filed by the plaintiffs.  True and correct copies of the denials that Plaintiffs have are attached as Exhibits 21, 22, 23, 24, 25, 26, 27, 28, 29 and 30.  On information and belief, FEMA has likewise denied the appeals from Dupo, Sauget and Venice.

107.     The Administrative Appeal Plaintiffs have filed a timely complaint seeking judicial review, as required by § 4104(g) and 44 C.F.R. § 67.12(a), in that this action was filed less than 60 days after FEMA denied their appeals.

108.     The   sole   basis   for   FEMA's   proposed   flood   elevation determinations was its conclusion that the alleged deficiencies in the levee system mean that it does not provide sufficient protection against a Base Flood.  The sufficiency of the levee system, the evidence on which FEMA relied, if any, and the evidence on which the Administrative Appeal Plaintiffs relied in their appeal to FEMA, present a pure scientific and technical question.

109.     FEMA's determination that the levee system cannot provide adequate protection against a Base Flood is arbitrary, capricious and an abuse of discretion, in that:

A.    There is no substantial scientific or technical evidence to support such a finding.  Despite repeated FOIA requests, neither FEMA nor the Corps has ever produced any such evidence.  In a February 24, 2010 letter from FEMA to Senator Richard Durbin, FEMA admitted that it "tried to obtain" information on the integrity of the levee system "from a variety of sources but to date have been unsuccessful," a claim that FEMA has never substantiated after several requests.

B.    FEMA entirely ignored the substantial scientific and technical evidence proving that the levee system is adequate, including the Corps' 2007 Inspection No. 8 which concluded that the system was "stable and operational."   FEMA also ignored the scientific and technical data submitted by the Administrative Appeal Plaintiffs in their appeal.

C.    To the extent that the Corps engaged in any analysis whatever of the adequacy of the levee system, it did so under the wrong legal standard.  FEMA is supposed to assess the strength of the levee system under the criteria set forth in 44 C.F.R. § 65.10.  Based on documents produced by the Corps, the Corps assessed the levee system under Corps criteria, which are significantly more demanding than § 65.10.

D.   Based on the documents produced by the Corps, the Corps misconstrued § 65.10, which requires that the levee have three feet of freeboard above the high water mark of the Base Flood.  Instead, the Corps erroneously assumed that the high water mark included three additional feet of flood water.

E.   Based on review of similar studies produced by the Corps, the Corps arbitrarily has determined not to consider existing equipment and plans for securing the levee system in the event of a Base Flood.  For example, the levee system has numerous functioning relief wells that deal with underseepage.  The Corps does not consider those wells, solely because they had exceeded their design life, ignoring evidence that the wells in fact function as intended during periods of high water.  Similarly, the Corps refused to consider the operators' flood fighting plans, even though the Corps employs precisely the same techniques on the Corps-owned Chain of Rocks levee, with which the Corps found no problem.

F.   FEMA waived the obligation to require new H&H studies of the area assuming the levees were de-accredited, solely for reasons of time and expense.  Those are not valid bases for waiving such studies.

G.   The residents of Madison, St. Clair and Monroe Counties have imposed a sales tax on themselves to pay for upgrades to the levee system to correct any actual or perceived deficiencies.   FEMA

44

arbitrarily refused to consider granting PAL status to the levee system during the time it will take to make such upgrades and prepare documentation to satisfy the requirements of § 65.10.

110.    FEMA's decisions on the adequacy of the levee system are arbitrary and capricious, and an abuse of discretion, for the additional reason that FEMA has refused to disclose the evidence, if any, on which it relied in making those decisions.  FEMA itself has kept much of that data secret, despite numerous requests both formal and informal for disclosure.

111.    The fact that FEMA has kept data and methodologies secret has prejudiced the Administrative Appeal Plaintiffs in that they have lacked access to a full administrative record in preparing their appeals, despite statutory and regulatory mandates that FEMA disclose such data and methodologies.

112.    In making its decisions about the adequacy of the levee system, FEMA failed to follow procedures required by law:

A.    42 U.S.C. § 4107 provides that FEMA "shall establish procedures assuring adequate consultation with the appropriate elected officials. The statute further provides that such procedures "shall include . . . fully informing local officials at the commencement of any flood elevation or investigation undertaken by any agency on behalf of" FEMA.  The stated purpose of such consultation is to "disseminate information concerning such study widely" so that "interested persons will have an opportunity to bring all relevant facts and

45

Case 3:10-cv-00919-JPG -DGW   Document 2   Filed 11/15/10   Page 46 of 56

technical data concerning the local flood hazard to the attention of the agency during the course of the study."

B.     To implement this mandatory duty, 44 C.F.R. § 66.1(c) provides that FEMA "shall":

(1)     Specifically request that the community submit pertinent data concerning flood hazards, flooding experience, plans to avoid potential hazards, estimates of historical and prospective economic impact on the community, and such other appropriate data (particularly if such data will necessitate a modification of a base flood elevation).

(2)     Notify local officials of the progress of surveys, studies, investigations, and of prospective findings, along with data and methods employed in reaching such conclusions; and

(3)     Encourage local dissemination of surveys, studies, and investigations so that interested persons will have an opportunity to bring relevant data to the attention of the community and to the Federal Insurance Administrator.

C.     In addition, 44 C.F.R. § 66.5 requires FEMA to accomplish the following:

(a)     Contact . . . appropriate officials of a community in which a proposed investigation is undertaken, and . . . state coordinating agency.

(b)     Local dissemination of the intent and nature of the investigation shall be encouraged so that interested parties will have an opportunity to bring relevant data to the attention of the community and to the Federal Insurance Administrator.

(c)     Submission of information from the community concerning the study shall be encouraged.

(d)     Appropriate officials of the community shall be fully informed of (1) The responsibilities placed on them by the Program, (2) the administrative procedures followed by the Federal

46

6216810-2

Emergency Management Agency, (3) the community's role in establishing elevations, and (4) the responsibilities of the community if it participates or continues to participate in the Program.

(e)     Before the commencement of an initial Flood Insurance Study, the CCO or other FEMA representative, together with a representative of the organization undertaking the study, shall meet with officials of the community. The state coordinating agency shall be notified of this meeting and may attend. At this meeting, the local officials shall be informed of (1) the date when the study will commence, (2) the nature and purpose of the study, (3) areas involved, (4) the manner in which the study shall be undertaken, (5) the general principles to be applied, and (6) the intended use of the data obtained. The community shall be informed in writing if any of the six preceding items are or will be changed after this initial meeting and during the course of the ongoing study.

(f)     The community shall be informed in writing of any intended modification to the community's final flood elevation determinations or the development of new elevations in additional areas of the community as a result of a new study or restudy. Such information to the community will include the data set forth in paragraph (e) of this section. At the discretion of the Regional Administrator in each FEMA Regional Office, a meeting may be held to accomplish this requirement.

44 C.F.R. § 66.5(a)-(f).

D.     FEMA complied with none of these duties mandated by statute and

regulation.  In connection with the 2007 Study, the PAL Status

Decision, the preliminary FIRMs and the November 2007

Directives, FEMA failed to consult with the local elected officials

and the local governments, including plaintiffs, at the

commencement of any studies and investigations; it failed to provide

information about the nature, purpose, manner or general principles

involved with any such study; it failed to inform local officials about

47

the use to be made of the data obtained; and it failed to offer any opportunity for the local communities or any interested persons to bring relevant facts and data to its attention during the course of the studies.

E.     As a result of FEMA's failure to follow the statute and regulations, plaintiffs had no opportunity to review, rebut or even to comment upon the various FEMA studies and investigations leading to the de-accreditation of the Levee Systems and the denial of PAL status.

F.     Had FEMA engaged in the required consultation, it could have obtained the necessary information to determine that the levee system adequately protects the American Bottoms, or at least was eligible for PAL treatment during the time the community is upgrading the system.

113.   FEMA's determination of the inadequacy of the levee system is contrary to the constitutional rights of all plaintiffs, for the reasons more fully set forth in Counts III through VI.

**Count II**
**(Declaratory Judgment – All Plaintiffs)**
**(Section 4104 and § 67.6 Violate Due Process As Applied)**

114.   Plaintiffs restate and hereby incorporate by reference the allegations of ¶¶ 1 through 113 of this Complaint.

115.    Plaintiffs believe that the adequacy of the American Bottoms Levee Systems is purely a scientific and technical question, such that statutory limitations on the scope of the administrative appeal and judicial review will not prevent the Administrative Appeal Plaintiffs from obtaining full review and complete relief.  In the alternative, should FEMA successfully argue otherwise, 42 U.S.C. § 4104 and 44 C.F.R. § 67.6 violate all plaintiffs' right to due process of law as applied to this case.

116.    FEMA's decertification of the levees and proposed flood elevation determinations, if implemented, will severely and adversely affect the economic interests of everyone who owns property in the American Bottoms:

A.    It will require persons living or doing business in that area to obtain flood insurance, at least if they have borrowed money from any federally regulated lending institution, even though many of the poor residents in the area cannot afford such insurance.

B.    It will effectively prohibit any development anywhere in the area, depriving residents of jobs and municipalities of tax revenues.

C.    It will devastate land values in the area.

As a matter of law, FEMA cannot cause such severe damage to property interests without affording plaintiffs due process of law.

117.    If the adequacy of the Levee Systems is not a scientific and technical question, then § 4104(g) and § 67.6 prohibit any judicial review of FEMA's decisions.  As a matter of law, it is a due process violation for Congress

49

to prohibit any judicial review of agency action.  Congress lacks the authority to violate due process or to authorize the executive to do so.

118.    For the reasons set forth in Counts III through VI, FEMA's decisions violate plaintiff's rights to due process and equal protection under the Fifth Amendment.

### Count III – All Plaintiffs
### (Due Process – Arbitrary And Capricious Deprivation Of Property)

119.    Plaintiffs restate and hereby incorporate by reference the allegations of ¶¶ 1 through 118 of this Complaint.

120.    FEMA's determination that the levee system is inadequate and its proposed flood elevation determinations are so arbitrary and capricious, and so lacking in factual support, that they violate due process.  These determinations have no substantial relation to public health, safety or general welfare.  FEMA's determinations are plainly contrary to the general welfare of the people who reside in or own property interests in the American Bottoms.

### Count IV – All Plaintiffs
### (Due Process – Failure To Provide Notice And Hearing)

121.    Plaintiffs restate and hereby incorporate by reference the allegations of ¶¶ 1 through 120 of this Complaint.

122.    At no time prior to the publication of the new flood estimate determinations did FEMA provide notice to plaintiffs of its contemplated de-

accreditation of the levee system or an opportunity to be heard on the adequacy of the system.

123.    The appeal permitted by § 4014(g) and 44 C.F.R. § 67.12(a) does not provide adequate process, both because of the limitations on the scope of the appeal and because an appeal after an agency has made a decision is no substitute for the opportunity to have input before a decision is made.  There are no exigent circumstances that would require FEMA to postpone notice and a hearing until after the decision has been made.

124.    In addition, the FEMA regulations previously cited require FEMA to give ample opportunity for pre-decision notice and comment.  FEMA's failure to follow its own regulations in and of itself violates due process.  Unless and until FEMA validly alters those regulations, it cannot arbitrarily deprive plaintiffs of the benefits thereof.

### Count V – All Plaintiffs
### (Due Process – Reliance On Secret Evidence)

125.    Plaintiffs restate and hereby incorporate by reference the allegations of ¶¶ 1 through 124 of this Complaint.

126.    On information and belief, the 2007 Corps study is the sole basis for FEMA's determination that the levee system is inadequate.  FEMA has never disclosed to plaintiffs any other basis for FEMA's determination.

127.    Despite numerous and repeated Freedom of Information Act requests, neither the Corps nor FEMA has provided plaintiffs with the alleged study.

128.    It is a violation of due process for an agency to rely on secret information, never disclosed to affected persons or entities, and which such persons or entities have no opportunity to rebut.

### Count VI – All Plaintiffs
### (Equal Protection)

129.    Plaintiffs restate and hereby incorporate by reference the allegations of ¶¶ 1 through 128 of this Complaint.

130.    On information and belief, other levee districts have levees with alleged deficiencies that are identical to those FEMA has alleged against the levee districts that protect the American Bottoms.  FEMA has not de-accredited those levee systems.  Instead, it has either retained their accreditation or given them PAL status.

131.    On information and belief, the Levee Systems are the only levees in the nation that have been rated "acceptable" or "minimally acceptable" by the Corps and have been de-accredited by FEMA.

132.    On information and belief, FEMA has consulted with other communities and other levee districts similarly situated to those that protect the American Bottoms concerning the adequacy of the other districts' levee systems. FEMA has asked other such communities and districts for evidence of the

adequacy of their systems.  It never did so for the American Bottoms communities or districts.

133.    FEMA's failure to consult communities and levee districts and obtain evidence about the adequacy of the levee systems is directly related to its decision to de-accredit the levees and hence to the injury that plaintiffs will sustain unless FEMA is enjoined from such de-accreditation.  Had FEMA engaged in the kind of consultation it did with other communities and other levee districts, FEMA would not have de-accredited the Levee Systems.

**WHEREFORE**, all Plaintiffs pray that the Court hear and determine this cause, and that the Court enter the following injunctive relief:

A.    All Plaintiffs pray that that the Court make and enter its preliminary and permanent injunction enjoining FEMA from issuing Letters of Final Determination and publishing final Flood Insurance Studies and Digital Flood Insurance Rate Maps for the American Bottoms Area of Madison, St. Clair and Monroe Counties, Illinois; and further permanently enjoining FEMA to comply fully with the consultation mandates required by 42 USC §41.07 and 44 CFR §66; and

B.    The Administrative Appeal Plaintiffs, namely St. Clair County, Metro East Sanitary District, Alton, Caseyville, Dupo, East Carondelet, Granite City, Madison, Pontoon Beach, Sauget and Venice pray that the Court make and enter its Order, having reviewed the whole record in this cause, compelling FEMA to comply with the mandates of 42 USC §41.07 and 44 CFR §66, and that the

Court enter an order holding as unlawful and setting aside the actions of FEMA to de-accredit the Metro East levee systems, and that the Court enter an order holding as unlawful and setting aside the preliminary Flood Insurance Studies and the preliminary Digital Flood Insurance Rate Maps for the American Bottoms area of Madison, St. Clair and Monroe Counties, Illinois, and that, during the pendency of this litigation, all final determinations of FEMA be stayed; and

C.     All Plaintiffs pray that the Court declare § 4107 and 44 C.F.R. § 67.6 violate due process to the extent they preclude judicial review of plaintiff's constitutional claims; and

D.     For such other and further equitable relief as the Court deems just and proper.

Respectfully Submitted,

*s/ William A. Mudge (with consent)*
WILLIAM A. MUDGE, IL Bar # 06190391
STATE'S ATTORNEY
MADISON COUNTY, ILLINOIS
John McGuire
Assistant State's Attorney
157 North Main Street, Suite 402
Edwardsville, IL 62025
(618) 692-6280
(618) 296-7001 (fax)
jpmcguire@co.madison.il.us
*Attorneys for Madison County Illinois*

54

6216810-2

*s/ Robert Haida (with consent)*
ROBERT HAIDA
STATE'S ATTORNEY
ST. CLAIR COUNTY, ILLINOIS
#10 Public Square – 2nd Floor
Belleville, IL 62220
(618) 277-3892
bhaida@co.st-clair.il.us
*Attorneys for St. Clair County, Illinois*


*s/ Kris F. Reitz (with consent)*
KRIS F. REITZ
STATE'S ATTORNEY
MONROE COUNTY, ILLINOIS
Monroe County Courthouse
100 South Main Street
Waterloo, IL 62298
(618) 939-8681
kreitz@htc.net
*Attorney for Monroe County, Illinois*


Sprague & Urban


*s/ Robert J. Sprague (with consent)*
Robert J. Sprague, IL Bar # 2693690
26 East Washington Street
Belleville, IL 62220-2101
(618) 233-8383
rsprague@spragueurban.com
*Attorneys for Plaintiffs*

55

Husch Blackwell LLP


*s/ Harry B. Wilson*
Harry B. Wilson, Lead Attorney
Southern District of Illinois Bar # 06276966
David Human
Mark G. Arnold
T.R. Bynum
190 Carondelet Plaza – Suite 600
St. Louis, MO 63105
(314) 480-1500
(314) 480-1505 – FAX
Harry.wilson@huschblackwell.com
David.human@huschblackwell.com
*Attorneys for Plaintiffs*